**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 03-4569**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GARLAND BENNETT GARRETT, JR.,

Defendant - Appellant.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington.   Terrence W. Boyle, Chief District Judge.  (CR-01-140-BO)

---

Submitted:  August 25, 2004         Decided:  February 15, 2005

---

Before WILKINS, Chief Judge, TRAXLER, Circuit Judge, and Roger W. TITUS, United States District Judge for the District of Maryland, sitting by designation.

---

Affirmed by unpublished opinion.  Judge Titus wrote the opinion, in which Chief Judge Wilkins and Judge Traxler joined.

---

R. Daniel Boyce, BOYCE & ISLEY, P.L.L.C., Raleigh, North Carolina; William Woodward Webb, Sr., William Woodward Webb, Jr., EDMISTEN & WEBB LAW FIRM, Raleigh, North Carolina; Anthony Brannon, BRANNON STRICKLAND, P.L.L.C., Raleigh, North Carolina, for Appellant. Frank D. Whitney, United States Attorney, Anne M. Hayes, Christine Witcover Dean, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

TITUS, District Judge:

Cape Fear Music Company, Inc. (Cape Fear) and the Appellant, Garland Bennett Garrett, Jr. (Garrett) were indicted by a grand jury in the United States District Court for the Eastern District of North Carolina for conducting a gambling business in violation of 18 U.S.C. §§ 1955 & 2, as well as conspiracy, wire fraud, mail fraud and money laundering. Garrett filed two motions to dismiss the second superseding indictment, which contained 276 counts. Following denial of his motions, Garrett entered a conditional plea of guilty to Count Two pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, reserving the right to appeal the denial of his motions to dismiss. The remaining counts were dismissed without prejudice pursuant to a written plea agreement, and Garrett was sentenced to five months of imprisonment, two years of supervised release, and a $5,000 fine. Garrett and Cape Fear were jointly ordered to forfeit $750,000. Garrett then appealed, challenging the denial of his motions to dismiss. Finding no error, we affirm.

## I.

Garrett's motions to dismiss the second superseding indictment were based on the grounds that: 1) North Carolina was violating his equal protection rights enumerated in the Fourteenth Amendment and the Declaration of Rights of the North Carolina Constitution by

3

prosecuting him for the same activities in which Native American tribes are permitted to engage; and 2) North Carolina's gaming laws violate the dormant commerce clause. For the reasons stated on the record at a hearing held before the district court on September 12, 2002, the district court denied the motions. J.A. 232.

Garrett's arguments below and in this Court stem from various state and federal laws and regulations which permit gambling to occur on Native American lands by Native American tribes, see J.A. 102 (Tribal - State Compact Between the Eastern Band of Cherokee Indians and the State of North Carolina), but deny the same privilege to non-Native American citizens, such as Garrett. Thus, when he provided video gambling games for numerous establishments, including the Elks Lodge of Wilmington, North Carolina, he was charged with violations of various gambling laws. Garrett asserts, and the Government does not deny, that if the same activities occurred on Native American tribal land and were administered by Native American tribes or assignees thereof, then those individuals would not have been charged with a crime. Gaming is permitted on Native American lands pursuant to the legal framework set forth in the Indian Gaming Regulatory Act (IGRA).

The IGRA permits Class III gaming activities, see 25 U.S.C. § 2703(6)-(8) (2004), on Indian lands provided that five requirements are met. 25 U.S.C. § 2710(d)(1). To be lawful the gaming activities must be

4

>(A) authorized by an ordinance or resolution that (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands, (ii) meets the requirements of subsection (b) of this section, and (iii) is approved by the Chairman, (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State[.]

25 U.S.C. § 2710(d)(1)(A), (B), & (C). The IRGA, known colloquially as a "cooperative federalism" statute, contemplates joint federal and state regulation. See Artichoke Joe's California Grand Casino v. Norton, 353 F.3d 712, 715 (9th Cir. 2003) (hereinafter "Artichoke Joe's"). In this case, the laws of North Carolina are implicated.

North Carolina, in accordance with the IGRA, permits gaming by federally recognized Indian tribes on tribal lands provided that such gaming is authorized by a Tribal-State Compact. N.C. Gen. § 71A-8 (2004). North Carolina facilitates gaming by Native Americans on tribal lands by specifically granting the Governor the power and duty "[t]o negotiate and enter into Class III gaming compacts, and amendments thereto, on behalf of the State consistent with State law and the [IGRA], as necessary to allow a federally recognized Indian tribe to operate gaming activities in this State as permitted under federal law." N.C. Gen. § 147-12 (2004).

In August, 1994, then North Carolina Governor James B. Hunt, Jr. entered into the Tribal - State Compact between the Eastern Band of Cherokee Indians and the State of North Carolina. J.A.

100-21. North Carolina, citing the IGRA and acknowledging that the Eastern Band of Cherokee Indians is a federally recognized Indian tribe, id. at 101, authorized, subject to various regulations, Class III gaming, the operation of video gaming devices, and the administering of raffles. Id. at 104-15. The Compact therefore explicitly permits the Eastern Band of Cherokee Indians to be purveyors of video poker, while other laws of North Carolina criminalize these same activities. See N.C. Gen. Stat. §§ 14-292, 14-295, 14-296, 14-301, 14-302, 14-303, 14-304, 14-305, 14-306.

## II.

Garrett argues that North Carolina's laws permitting Native American-run gambling on tribal lands, but denying the same to all other citizens, violates his equal protection rights as guaranteed by the Fourteenth Amendment, his due process rights as guaranteed by the Fifth Amendment, the equal protection guarantee in the Declaration of Rights of the North Carolina Constitution, and the "dormant" Commerce Clause. Specifically, Garrett argues that it is unconstitutional that Harrah's, in business with the Eastern Band of Cherokee Indians, is immune from North Carolina and federal laws, while he, in business with, inter alia, the Elks Club, should be prosecuted under the same laws. Appellant's brief at 7.

Garrett's assertions are clearly contrary to previous holdings of the Supreme Court, which have carved-out a legitimate special

6

class for Native American gaming preferences due to the unique historical relationship between the United States and Native American nations, as well as constitutional authorization emanating from the "Indian commerce clause." U.S. Const. Art. I sect. 8. Thus, following the Supreme Court's guidance in this area of jurisprudence, we affirm the district court's denial of Garrett's Motions to Dismiss.

A.

Garrett argues that North Carolina laws authorizing Native American gaming violate the Fourteenth Amendment's guarantee of equal protection of the laws. He contends that because the Native American gaming preferences favor Native Americans based solely on their race, such laws should be subjected to strict scrutiny. Garrett acknowledges the Supreme Court's decision in Morton v. Mancari, 417 U.S. 535 (1974), where the Court held that "legislation that singles out Indians for particular and special treatment[]" shall be upheld "where the preference is reasonable and rationally designed to further Indian self-government," id. at 554-55, but contends that the Supreme Court's more recent decision in Adarand Constructors v. Peña, 515 U.S. 200 (1995) requires a departure from the application of the rational basis review for Native American preferences. In Adarand, the Supreme Court stated that "all governmental action based on race . . . should be subjected to detailed judicial inquiry to ensure that the *personal*

7

right to equal protection of the laws has not been infringed." <u>Id</u>. at 227. Thus, Garrett argues that the Court's broad statement in <u>Adarand</u> means that "<u>Mancari's</u> days are numbered." <u>Williams v. Babbitt</u>, 115 F.3d 657, 665 (9th Cir. 1997) (citing Stuart Minor Benjamin, *Equal Protection and the Special Relationship; The Case of Native Hawaiians*, 106 Y<small>ALE</small> L.J. 537, 567 (1996)).

The argument that <u>Adarand</u> has changed the level of scrutiny for Native American preferences has been rejected by other courts. <u>See</u> <u>Am. Fed'n of Gov. Employees, AFL-CIO v. United States</u>, 330 F.3d 513, 517, 519-21 (D.C. Cir. 2003) (hereinafter "Am Fed'n"). Garrett does not attempt distinguish <u>Am. Fed'n</u>, but instead relies on <u>Williams v. Babbitt</u>, 115 F.3d 657 (9th Cir. 1997) for the proposition that if the government's preference does not "relate[] to native land, tribal or communal status, or culture[]" then the preference should be subjected to strict scrutiny. <u>Id</u>. at 664. Garrett further contends that, unlike <u>Mancari</u> (where the preference clearly related to self-government, i.e., a statute permitting hiring preferences for the Bureau of Indian Affairs), the preference in this case is not clearly related to uniquely Indian issues and should not receive rational basis review.

Garrett's reliance on <u>Williams</u> is misplaced. The same court that decided <u>Williams</u> subsequently upheld a California gaming preference for Native Americans, similar to the one at issue in this case. <u>Artichoke Joe's</u>, 353 F.3d 712. <u>Artichoke Joe's</u>

8

succinctly explained the differences between <u>Williams</u> and situations in which gaming preferences are given to Indian tribes. Because Garrett has relied so heavily upon a decision from our sister circuit, and the analysis in <u>Artichoke Joe's</u> is consistent with <u>Mancari</u> and its progeny, we find it appropriate to quote this decision at length:

> Plaintiffs' suggestion that <u>Williams</u> controls the outcome of the present case ignores the obvious distinctions between an unqualified preference for individual native Alaskans [at issue in <u>Williams</u>] and the limited preference for tribes reflected in the text of IGRA [at issue in this case]. The *operative terms* of IGRA expressly relate only to *tribes*, not to individual Indians. . . . Further, through IGRA's compacting process, and through its reliance on tribal governments and tribal ordinances to regulate class III gaming, the statute relates to tribal status and tribal self-government. The very nature of a Tribal-State compact is political; it is an agreement between an Indian tribe, as one sovereign, and a state, as another. . . . Additionally, unlike the legislation construed in <u>Williams</u>, IGRA pertains only to *Indian lands*. Like the vast majority of statues by which Congress fulfills its obligations to the Indian tribes, IGRA regulates activities only on Indian lands. . . . Accordingly, IGRA falls squarely within the rule of <u>Mancari</u>. <u>Williams</u> continued to recognize that a statue relating to tribal self-government, to tribal status, or to Indian lands is subject to rational-basis review. IGRA is just such a statute, notwithstanding the dictum in <u>Williams</u> that doubted whether Congress could give "Indians a complete monopoly on the casino industry." As our lengthy discussion of the statue has made clear, IGRA does not give "Indians" a monopoly; it neither relates to "Indians" (as distinct from federally recognized tribes) nor, itself, creates a monopoly.

<u>Artichoke Joe's</u>, 353 F.3d 734-35 (internal citations omitted). We concur with the Ninth Circuit's interpretation of <u>Mancari</u> in relation to Tribal-State Compacts under the IRGA.

9

Considering this application of Mancari, Garrett's argument that the Court's decision in Adarand requires Native American gaming preferences to be subjected to strict scrutiny must be rejected for two reasons. First, Adarand held that "all *racial* classifications . . . must be analyzed by a reviewing court under strict scrutiny." Adarand, 515 U.S. at 227 (emphasis added). Preferences given to Indian tribes, however, are *not racial preferences*; they are "political rather than racial in nature." Mancari, 417 U.S. at 554 n. 24; see also Rice v. Cayetano, 528 U.S. 495, 519-20 (2000); Artichoke Joe's, 353 F.3d at 734. Therefore, Adarand's broad statement does not require that the IGRA or the laws authorizing North Carolina's Tribal - State Compact be subjected to strict scrutiny. Second, even if we did not recognize the distinction between racial and political preferences, we find it difficult to conclude, as Garrett suggests, that Mancari, a case dealing with Native American preferences, is not more on point than Adarand. Therefore, we find the Supreme Court's discussion in Agostini v. Felton, 521 U.S. 203 (1997) to be instructive.

In Agostini, the Supreme Court offered guidance to the lower federal courts, explaining that the Court "do[es] not hold[] that other courts should conclude [that the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent." Id. at 238. The Court "reaffirmed that '[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to

10

rest on reasons rejected in some other line of decision, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions.'" Id. (quoting Rodriquez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989)). We find this principle to be directly implicated in this case and refuse to reject the reasoning of Mancari by relying on Adarand. See American Greyhound Racing, Inc. v. Hull, 146 F. Supp. 2d 1012, 1077 (D. Ariz. 2001) vacated on other grounds 305 F.3d 1015 (9th Cir. 2002).

Applying the rational basis standard for Indian tribal preferences set forth in Mancari, we hold that the gaming preferences given to the Eastern Band of the Cherokee Indians are rationally related to a legitimate governmental interest. The laws creating this preference "promot[e] the economic development of federally recognized Indian tribes (and thus their members)[.]" Am. Fed'n, 330 F.3d at 522-23. The Supreme Court has explicitly held that this goal constitutes not just a legitimate, but an important government interest. See California v. Cabazon Band of Mission Indians, 480 U.S. 202, 216-17 (1987) (explaining that the goals of tribal self-sufficiency and overall economic development are "important federal interests."). It also appears undisputed that gaming operators derive significant profits from their business. Therefore, gaming preferences for Indian tribes conducted on tribal land are a rational means of ensuring the economic development of

11

the Eastern Band of Cherokee Indians.  For these reasons, North Carolina's State-Tribal Compact and the scheme set forth by the IGRA easily pass muster under the rational basis standard of review.

B.

**<u>Dormant Commerce Clause Claim</u>**

Garrett's second major attack on his prosecution is premised on an alleged violation of the commerce clause.  Although the commerce clause is an enumerated power of Congress to "regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes," U.S. CONST. ART. I, sect. 8, from very early in this country's history the Supreme Court has recognized that this grant of power to Congress necessarily restricts state action.  See e.g., <u>Gibbons v. Ogden</u>, 22 U.S. (9 Wheat.) 1 (1824). This concept, as alive today as it was in the early 19th century, see <u>Harper v. Public Service Commission of West Virginia</u>, No. 04-1444, slip op. at 12 (4th Cir. Jan. 24, 2005) ("[E]ven when Congress has not acted, the Supreme Court has long recognized that the Commerce Clause nonetheless divests states of any interest which unduly burdens interstate commerce."), has become known as the "dormant" commerce clause.  The dormant commerce clause prohibits states from burdening interstate commerce or from discriminating against out-of-state business.  See e.g., <u>West Lynn Creamery, Inc. v. Healy</u>, 512 U.S. 186, 192-94 (1994).

12

Garrett argues that "there is clearly discrimination on the face of the laws and treaties of North Carolina" because "Mr. Garrett, who provided video poker machines to the Elks Club, was prosecuted [while] Harrah's, which operates in and through North Carolina provid[ing] video poker games in interstate commerce and advertises in interstate commerce, is immune from prosecution by state and federal law enforcement authorities[.]" Appellant's brief at 36. We cannot agree that this statement asserts a viable claim for a violation of the dormant commerce clause.[*]

The dormant commerce clause is violated when the laws of a state treat in-state entities and out-of-state entities differently. The Supreme Court has also found a violation of the dormant commerce clause when state laws were ostensibly applied

_____

[*] To the extent that Garrett argues that the dormant commerce clause is violated because Harrah's operates in numerous states while he only operates in North Carolina, he misreads prior case law. The fact that Harrah's operates and advertises in numerous states, and has been granted the ability to engage in gaming activities in North Carolina, does not suggest a violation of the dormant commerce clause. If Harrah's were permitted to engage in gaming only because it operated in numerous states, while those businesses that operate only in North Carolina were not permitted to engage in gaming, then perhaps there might be a violation. First, that is not the situation in this case. Harrah's is able to engage in gaming because of North Carolina's Tribal-State Compact with the Eastern Band of Cherokee Indians and the agreement between Harrah's and the Eastern Band, not because of Harrah's "interstate" character. Second, this would be an unusual type of discrimination: North Carolina would be discriminating *against its own citizens* and in favor of out-of-state businesses. If Garrett's dormant commerce clause contention is that North Carolina has favored an interstate business over his own, simply because it is an out-of-state, rather than in-state, business, then his argument must fail.

equally, yet the burden on interstate commerce outweighed the benefits of such a law.  For example, the Supreme Court invalidated a state law requiring a particular type of mud flap on trucks because it was too burdensome to require truckers transporting goods in interstate commerce to stop at the state line and change an accessory on their vehicles.  <u>Bibb v. Navajo Freight Lines, Inc.</u>, 359 U.S. 520 (1959).

Garrett's claims are not at all similar to the typical dormant commerce clause cases.  <u>Cf</u>. <u>Beskind v. Easley</u>, 325 F.3d 506 (4th Cir. 2003) (North Carolina ABC laws treated in-state manufacturers of wine differently than out-of-state manufacturers and thus violated the dormant commerce clause).  In this case, regardless of whether a citizen or entity lives in North Carolina or in another state, that person or entity will be prosecuted for a violation of gambling laws if gambling mechanisms are provided to non-Native American establishments, but not be prosecuted when the end users are Native American-run establishments operating on tribal lands. Thus, there is no unequal treatment vis-à-vis North Carolinians and residents of other states.  Nor are the North Carolina laws unduly burdensome on interstate commerce.

The cases cited by Garrett are inapposite.  Cases such as <u>Bacchus Imports, Ltd. v. Dias</u>, 468 U.S. 263 (1984) and <u>Beskind</u>, 325 F.3d 506 dealt with laws that explicitly treated in-state manufacturers differently than their out-of-state counterparts.

14

Such discrimination is not occurring in this case, as both in-state and out-of-state gambling purveyors are either subjected to, or exempted from, the laws of North Carolina, depending on their status or that of their business partners. They are not subjected to different laws because of their residence inside or outside of North Carolina. Thus, Garrett's argument fails to state a violation of the dormant commerce clause.

For the aforementioned reasons, we affirm the ruling of the district court.

<u>AFFIRMED</u>

15