[No. A098186. First Dist., Div. Two. Dec. 26, 2002.]

LARRY FLYNT et al., Plaintiffs and Appellants, v.
CALIFORNIA GAMBLING CONTROL COMMISSION et al., Defendants
and Respondents.

**COUNSEL**

Michael Franchetti for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Robert L. Mukai, Assistant Attorney General, Sara J. Drake, Marc A. Le Forestier and Kathleen E. Gnekow, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**RUVOLO, J.—**

I.

In March 2000, the overwhelming majority of California voters passed Proposition 1A,[1] which amended the California Constitution, giving the Governor the authority "to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking games by federally recognized Indian tribes on Indian lands in California in accordance with federal law." (Cal. Const., art. IV, § 19, subd. (f).)

---

[1] "California voters approved the passage of Proposition 1A by a landslide sixty-five percent. [Citation.]" (Comment, *Gambling on Proposition 1A: The California Indian Self-Reliance Amendment* (2002) 36 U.S.F. L.Rev. 1033, 1044, fn. 90 (*Proposition 1A*).)

Larry Flynt, a card room owner, and Hustler Casino and Normandie Casino, state-licensed card rooms located in Los Angeles (collectively appellants), challenge the legality of agreements entered into by the State of California with 62 Native American Indian (Indian)[2] tribes pursuant to Proposition 1A. Specifically, appellants claim that the tribal-state gambling agreements, known as compacts, which permit Indian tribes to conduct gaming prohibited to appellants and others by state law, violate the federal Indian Gaming Regulatory Act (IGRA) (25 U.S.C. § 2701 et seq.)[3] and infringe upon appellants' right to equal protection of the laws (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) They appeal from a judgment entered after a demurrer to their amended complaint was sustained without leave to amend. We reject these arguments and affirm the judgment dismissing appellants' case.

## II.

On November 26, 2001, appellants filed a first amended complaint for declaratory relief asking the superior court to declare the respective rights, duties, and responsibilities of the California Gambling Control Commission and Attorney General Bill Lockyer (respondents) under specified Penal Code sections prohibiting certain forms of gambling (Pen. Code, §§ 330, 330a & 330b) and the Gambling Control Act (Bus. & Prof. Code, § 19800 et seq.). Respondents were named as defendants in the lawsuit because they have the authority to license appellants and to impose administrative and criminal sanctions upon appellants for violation of California statutes and regulations dealing with gambling. The Indian tribes that have entered into compacts with the state are not parties to this litigation.[4]

---

[2] In using the term "Indian," we adopt the nomenclature used in the federal legislation and the California constitutional amendment that are the focus of this appeal.

[3] All further undesignated section references are to title 25 of the United States Code.

[4] On September 19, 2002, the Ninth Circuit Court of Appeals decided *American Greyhound Racing, Inc. v. Hull* (9th Cir. 2002) 305 F.3d 1015 (*American Greyhound Racing*). In its decision, the court decided that Indian tribes with gaming compacts issued under Arizona law were necessary and indispensable parties to litigation challenging the Arizona Governor's actions in negotiating and extending the gaming compacts. The Ninth Circuit concluded that the case must be dismissed because the tribes enjoy sovereign immunity from suit and had not given consent to be sued. (*Id.* at p. 1027.) Unlike *American Greyhound Racing*, where the failure to join the compacting tribes as necessary and indispensable parties was raised in the federal district court, none of the parties to this litigation have claimed in the trial court or in their respective briefs that the absent Indian tribes are indispensable to this litigation. As a consequence, we would not entertain such a contention now. (*McKeon v. Hastings College* (1986) 185 Cal.App.3d 877, 889 [230 Cal.Rptr. 176]; *Strauss v. Summerhays* (1984) 157 Cal.App.3d 806, 814 [204 Cal.Rptr. 227]; *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 242 [193 Cal.Rptr. 312]; *Kraus v. Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 370, fn. 11 [140 Cal.Rptr. 744].)

Appellants' complaint points out that under various state laws, they are not allowed to conduct class III games, such as banked games[5] or percentage games,[6] nor are they allowed to operate slot machines. (Pen. Code, §§ 330, 330a & 330b; see generally *Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 592-594 [88 Cal.Rptr.2d 56, 981 P.2d 990] (*Hotel Employees*).) Instead, state law authorizes appellants to offer only controlled games, such as nonbanked card games, where players pay a fee to play on a per-hand or per-hour basis.

The complaint explained that on March 1, 2000, the voters of the State of California adopted Proposition 1A, which authorized members of federally recognized Indian tribes to operate slot machines, lottery games, and banked and percentage card games only on tribal lands and only under the terms of duly negotiated and ratified compacts. It was alleged that the Governor of California had entered into compacts with 62 Indian tribes in California allowing such games to be offered to the public.

Appellants alleged that if they "were to offer such games to the public they would be subject to sanctions . . . pursuant to the Gambling Control Act including loss of license, fines, and referral for criminal prosecution." Appellants further alleged that they "directly compete with Indian owned casinos for customers who wish to patronize casinos. The banked and percentage card games, 21, and slot machines which [respondents] authorize only Indian[-]owned casinos to offer to the public are more attractive to the public than the non[-]banked card games allowed [appellants]." Appellants alleged that this "state sanctioned monopoly" in gambling operations put them at a "competitive and economic" disadvantage that threatens their ability to stay in business.

Appellants also alleged that the IGRA, the federal statute governing the operation of games conducted by Indian tribes, "does not authorize a state to establish a classification such as that in California wherein only Indian Tribes and Native Americans which comprise their membership are allowed to offer class III gaming while non-Indians are subject to criminal and other sanctions for engaging in the same conduct." Appellants claimed that, to the extent provisions of the Penal Code and Gambling Control Act enforced by respondents prevented appellants from offering the games that were legally offered at tribal casinos, these provisions were "unconstitutional, invalid, and void" under the equal protection clauses of the federal and state constitutions. (See U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).)

---

[5]"Banked" games are where the house has a stake in the outcome of the game. (See *Rumsey Indian Rancheria of Wintun Ind. v. Wilson* (9th Cir. 1994 64 F.3d 1250, 1255, fn. 2 (*Rumsey*).)

[6]"Percentage" games are where the house collects a given share of the amount wagered. (See *Rumsey, supra*, 64 F.3d at p. 1255, fn. 2.)

Consequently, appellants sought declaratory relief removing the legal obstacles that prohibited them "from offering to the public bank[ed] and percentage games, '21', and slot machines." They requested a decision "that such games are controlled games which may be offered by [appellants] pursuant to the applicable provisions of the Gambling Control Act."

On December 21, 2001, respondents filed a demurrer to appellants' first amended complaint, arguing that the complaint failed to state facts sufficient to constitute a cause of action. Respondents challenged the viability of appellants' legal theories and argued that nothing in appellants' complaint entitled them to declaratory relief allowing appellants to operate slot machines and banked and percentage card games otherwise prohibited by California law.

On February 11, 2002, the trial court sustained respondents' demurrer to the first amended complaint without leave to amend. Following entry of a judgment of dismissal, this timely appeal followed. On appeal, this court must determine independently whether the facts alleged by appellants and the matters that may be judicially noticed entitle respondents to judgment as a matter of law. (Code Civ. Proc., § 438, subds. (c)(1)(B)(ii) & (d); *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216 [70 Cal.Rptr.2d 745]; *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

## III.

### A.

The issues raised in this appeal need not embroil this court in questions concerning the wisdom, policy implications, or economics of allowing Nevada-style gaming on Indian land in California, or elsewhere. Despite ongoing debate in some political quarters, as well as in the media,[7] the fact remains that these complex questions of public policy were largely answered when voters resoundingly approved Proposition 1A, thereby paving the way for the operation of slot machines and lottery games as well as banked and percentage card games by federally recognized Indian tribes on Indian lands in California. Our only task is to determine whether the tribal-state gambling compacts that were entered into pursuant to Proposition 1A—which grant an exclusive franchise to certain Indian tribes to conduct such games—violate provisions of the IGRA and/or create an unconstitutional monopoly in violation of the guarantee of equal protection of the laws.

---

[7]See Bartlett et al., *Wheel of Misfortune* (Dec. 16, 2002) Time; Bartlett et al., *Playing the Political Slots* (Dec. 23, 2002) Time.

To date, there is no decision by a California state court addressing these issues. However, on August 5, 2002, shortly after the instant appeal became fully briefed, the United States District Court for the Eastern District of California issued an opinion rejecting the identical arguments that appellants make in this appeal. (*Artichoke Joe's v. Norton* (E.D.Cal. 2002) 216 F.Supp.2d 1084 (*Artichoke Joe's*).)[8] ▮ Lower federal court decisions on federal questions, while not binding, are persuasive and entitled to great weight in state court. (See, e.g., *Yee v. City of Escondido* (1990) 224 Cal.App.3d 1349, 1351 [274 Cal.Rptr. 551]; *People v. Estrada* (1965) 234 Cal.App.2d 136, 145 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307].) In deciding these identical questions, we find the analysis in *Artichoke Joe's* persuasive, and therefore, we are moved to give it the great weight to which its compelling rationale is entitled.

## B.

▮ " 'It is a long and well-established principle of Federal Indian law as expressed in the United States Constitution, reflected in Federal statutes, and articulated in decisions of the Supreme Court, that unless authorized by an act of Congress, the jurisdiction of State governments and the application of state laws do not extend to Indian lands. In modern times, even when Congress has enacted laws to allow a limited application of State law on Indian lands, the Congress has required the consent of tribal governments before State jurisdiction can be extended to tribal lands. . . .' " (*Kansas v. U.S.* (10th Cir. 2001) 249 F.3d 1213, 1223, fn. 6, quoting the Senate Report accompanying the IGRA's passage.) " '[T]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history. . . .' " (*McClanahan v. Arizona State Tax Comm'n* (1973) 411 U.S. 164, 168 [93 S.Ct. 1257, 1260, 36 L.Ed.2d 129], quoting *Rice v. Olson* (1945) 324 U.S. 786, 789 [65 S.Ct. 989, 991, 89 L.Ed. 1367].)

In the mid-1980's, Indian tribes began to engage in significant gaming operations. (*Proposition 1A, supra*, 36 U.S.F. L.Rev. at p. 1038; see also Wolf, *Killing the New Buffalo: State Eleventh Amendment Defense to Enforcement of IGRA Indian Gaming Compacts* (1995) 47 Wash. U. J. Urb. & Contemp. L. 51, 69 (*Killing the New Buffalo*); Henderson, *Symposium: Indian Gaming: Social Consequences* (1997) 29 Ariz. St. L.J. 205, 206.) Such activities were controversial because the tribes generally refused to comply with state gambling laws, a situation that developed into a serious point of contention with state governments.

Prior to the enactment of the IGRA, numerous bills were introduced in Congress to address the issue of gaming on Indian lands. In 1987, the United

---

[8]We were informed by the parties at oral argument that an appeal has been filed in *Artichoke Joe's*.

States Supreme Court decided *California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202 [107 S.Ct. 1083, 94 L.Ed.2d 244] (*Cabazon*), which finally spurred the passage of federal gaming legislation. The issue in *Cabazon* was whether the State of California could apply its gaming regulations to tribal bingo and card games. (*Id.* at p. 205 [107 S.Ct. at p. 1086].) The state regulations did not prohibit such games, but restricted them to charitable organizations and imposed limitations on the amount of prizes that could be awarded and restricted the use of profits to charitable purposes. (*Ibid.*) Recognizing that "Indian tribes retain 'attributes of sovereignty over both their members and their territory,' " the court first held that Congress had not allowed the state to assume jurisdiction over gaming activities under Public Law No. 280[9] because the state's regulations relating to these forms of gaming were civil and regulatory in nature and not criminal and prohibitory. (*Cabazon,* at p. 207 [107 S.Ct. at p. 1087].) Because California allowed a substantial amount of gambling activity and even promoted gambling through its state lottery, the court concluded, "California regulates rather than prohibits gambling in general and bingo in particular." (*Id.* at p. 211 [107 S.Ct. at p. 1089].)

The court next addressed whether state regulations would interfere with reservation self-government or would impair a right granted or reserved by federal law. (*Cabazon, supra,* 480 U.S. at p. 216 [107 S.Ct. at pp. 1091-1092].) Acknowledging the tribe's interest in raising revenues and the efforts of the federal government in promoting economic development through Indian gaming, the *Cabazon* court concluded that "the State's interest in preventing the infiltration of the tribal bingo enterprises by organized crime does not justify state regulation of the tribal bingo enterprises in light of the compelling federal and tribal interests supporting them." (*Id.* at p. 222 [107 S.Ct. at pp. 1094-1095].) The Supreme Court ultimately concluded that states generally may not enforce their gambling laws on Indian lands because this would undermine the federal policy of encouraging tribal independence and economic development. (*Id.* at pp. 218-222 [107 S.Ct. at pp. 1093-1095].) In sum, the *Cabazon* decision provided tribes the right to conduct any form of gambling activity, regardless of state laws, unless the state *prohibited*, rather than *regulated*, gambling.

The congressional response to *Cabazon* was swift, and within a year Congress passed the IGRA. (See *Rumsey, supra,* 64 F.3d at p. 1257.) By enacting the IGRA, Congress intended "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."

---

[9]In Public Law No. 280, Congress granted certain states, including California, broad criminal jurisdiction over offenses committed by or against Indians on Indian lands within the states' borders.

(§ 2702(1).) The IGRA was also intended to prevent the infiltration of organized crime and other corrupting influences, to ensure that Indian tribes were the primary beneficiaries of the gaming operation, to assure that gaming on Indian lands was conducted fairly and honestly, and to establish federal authority and standards over gaming. (§ 2702(1)(2).)

The IGRA establishes three classes of gaming activity, each subject to differing degrees of tribal, state and federal jurisdiction and regulation. Class I gaming is limited to social games solely for prizes of minimal value or gaming connected to traditional tribal ceremonies or celebrations. (§ 2703(6).) This class of gaming is within the exclusive jurisdiction of the Indian tribes. (§ 2710(a)(1).)

Class II gaming includes bingo and related games and certain nonbanked card games. (§ 2703(7)(A)(i), (ii).) Class II gaming is within the exclusive jurisdiction of the tribes but is subject to oversight by the National Indian Gaming Commission (NIGC). (§§ 2710(1)(b), 2704 [description of NIGC].)

Class III gaming includes all other forms of gaming. (§ 2703(8).) It encompasses the most important part of the IGRA because it includes high-stakes casino-type games that can be a source of substantial revenue for the Indian tribes and a significant rival for traditional private sector gaming facilities, such as those run by appellants. The regulation of class III gaming has been the most controversial part of the IGRA and the subject of considerable litigation between various Indian tribes and the states. (See, e.g., *Mashantucket Pequot Tribe v. State of Conn.* (D.Conn. 1990) 737 F.Supp. 169, affd. (2d Cir. 1990) 913 F.2d 1024, cert. den. (1991) 499 U.S. 975 [111 S.Ct. 1620, 113 L.Ed.2d 717]; *Keweenaw Bay Indian Community v. U.S.* (6th Cir. 1998) 136 F.3d 469, 474, cert. den. (1998) 525 U.S. 929 [119 S.Ct. 335, 142 L.Ed.2d 277]; *U.S. v. Santee Sioux Tribe of Nebraska* (8th Cir. 1998) 135 F.3d 558.)

The IGRA requires that class III gaming may be conducted only after a tribe has negotiated a compact with the state for the regulation of the gaming, the Secretary of the Interior has approved the compact, and the tribe has adopted an ordinance or resolution approved by the chair of the NIGC. (§ 2710(d); see also *Coeur d'Alene Tribe v. State* (D.Idaho 1994) 842 F.Supp. 1268, 1282-1283, affd. (9th Cir. 1995) 51 F.3d 876 [under the IGRA, class III gaming activities could not lawfully be conducted on Indian reservation absent a tribal ordinance and a tribal-state gaming compact].)

Any Indian tribe having jurisdiction over lands where class III gaming is to be conducted "shall request the State in which such lands are located to

enter into negotiations for the purpose of entering into a Tribal-State compact . . . . Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact." (§ 2710(d)(3)(A).) The compact mechanism gives the state an opportunity to either influence or directly regulate class III gaming on Indian lands. (§ 2710(d)(3)(A).) The compact can even extend state civil and criminal jurisdiction onto Indian lands. (§ 2703(d)(3)(C)(i)-(vii); *Killing the New Buffalo, supra,* 47 Wash. U. J. Urb. & Contemp. L. at p. 61.) In this state/tribe negotiation over the conduct of class III gaming, the tribe is recognized as a sovereign entity entitled to negotiate on a roughly equal footing with the state, another sovereign entity—"albeit sovereigns subordinate to the federal union." (*Hotel Employees, supra,* 21 Cal.4th at p. 612.)

To ensure that states negotiated with tribes in good faith, the IGRA provides the United States District Courts with jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact . . . or to conduct such negotiations in good faith." (§ 2710(d)(7)(A)(i).)[10] In such a suit, a mediator appointed by the court, rather than the parties, would choose the terms of Indian gaming in the state, which the Secretary of the Interior would then implement. (§ 2710(d)(7).)

However, Congress stopped short of giving tribes the unilateral power to force any state to grant tribes full casino-style class III gaming when such gaming is not permitted by the laws and public policy of that state. Instead, Congress provided that states are required to negotiate with Indian tribes only as to those class III gaming activities permitted under state law. The IGRA recognizes that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." (§ 2701(5).) Thus, in the key provision we are called upon to construe in this appeal, the IGRA provides that "Class III gaming activities shall be lawful on Indian lands only if such activities are . . . [¶] . . . [¶] . . . located in a State that permits such gaming for any purpose by any person, organization,

---

[10]In 1996, the United States Supreme Court diluted this remedial provision when it decided *Seminole Tribe of Fla. v. Florida* (1996) 517 U.S. 44 [116 S.Ct. 1114, 134 L.Ed.2d 252]. The court held that Congress did not have the power to abrogate the 11th Amendment sovereign immunity of a state. (517 U.S. at p. 76 [116 S.Ct. at pp. 1133-1134].) Therefore, the IGRA could not grant a federal court jurisdiction over a state that did not consent to be sued by a tribe for a breach of good faith negotiation.

or entity . . . ." (§ 2710(d)(1)(B).)[11] "Consequently, where a state does not 'permit' gaming activities sought by a tribe, the tribe has no right to engage in these activities, and the state thus has no duty to negotiate with respect to them." (*Rumsey, supra,* 64 F.3d at p. 1256.)

Following the enactment of the IGRA, the State of California and various tribes in California attempted to conclude tribal-state compacts. However, the state and the tribes disagreed about the forms of gaming that would be permitted and the content of the compacts. (See, e.g., *Rumsey, supra,* 64 F.3d at p. 1255; *Hotel Employees, supra,* 21 Cal.4th 585.)

Against this backdrop, proponents of tribal gaming sought voter approval of an initiative designed to facilitate tribal-state compacts. (See Gov. Code, § 98001, subd. (b) [measure intended to end "uncertainties" regarding class III gaming by tribes].) In November 1998, state voters approved The Tribal Government Gaming and Economic Self-Sufficiency Act of 1998, otherwise known as Proposition 5. (See Gov. Code, § 98000 et seq.) The proposition, which amended state law but not the State Constitution, required the state to enter into a model "Tribal-State Gaming Compact" with Indian tribes to allow certain class III gambling activities, such as banked card games and slot machines. (See *Hotel Employees, supra,* 21 Cal.4th at p. 606.) Proposition 5 obligated the Governor to execute compacts as a ministerial act within 30 days after any federally recognized Indian tribe requested such an arrangement. (*Id.* at p. 590.) Under the plan, the compacts were deemed approved if the governor took no action within 30 days. (*Ibid.*) The measure won overwhelming support from California voters, but the victory was short-lived.

In August 1999, Proposition 5 was ruled unconstitutional by our Supreme Court in *Hotel Employees, supra,* 21 Cal.4th 585, because it was found to be inconsistent with a 1984 amendment to the state's constitution banning casino-type gambling in California. (*Id.* at pp. 612-613; see Cal. Const., art. IV, § 19, subd. (e) ["The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey."].) The court ruled that the federal IGRA did not preempt application of this state constitutional anti-casino provision to tribal gaming. (*Hotel Employees,* at pp. 611-612.)[12]

Proponents of Indian gaming addressed this deficiency with the passage of Proposition 1A. Unlike the statutory provisions of Proposition 5, Proposition

---

[11]IGRA's class II gaming provisions contain similar language: "An Indian tribe may engage in . . . class II gaming on Indian lands . . . if [¶] . . . such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity . . . ." (§ 2710(b)(1)(A).)

[12]However, the court upheld as constitutional the final sentence of Government Code section 98005, enacted as part of Proposition 5, which waived California's immunity from

1A amended article IV, section 19 of the California Constitution, giving the Governor the constitutional authority to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines, lottery games, as well as banked and percentage card games, by federally recognized Indian tribes on Indian lands in California in accordance with federal law.

### C.

The passage of Proposition 1A led to the tribal-state compacts that are at issue in this case. These compacts are effective until December 31, 2020, and are identical in most respects. The compacts permit each signatory tribe to operate "gaming devices" or slot machines, banked or percentage card games, as well as any devices or games that the California State Lottery is authorized to offer.

The compacts contain the following language: "The exclusive rights that Indian tribes in California . . . will enjoy under this Compact create a unique opportunity for [each] Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming . . . on non-Indian lands in California. The parties are mindful that this unique environment is of great economic value to the Tribe . . . . In consideration for the exclusive rights enjoyed by the tribes, and in further consideration for the State's willingness to enter into this compact, the tribes have agreed to provide to the State, on a sovereign-to-sovereign basis, a portion of its revenue from Gaming Devices." The compacts also require gaming tribes to fund an Indian Revenue Sharing Trust Fund, which is a mechanism for redistributing some of the wealth generated by gambling for the benefit of tribes in California that do not conduct gaming. (See *In re Indian Gaming Related Cases* (N.D.Cal. 2001) 147 F.Supp.2d 1011; *Proposition 1A, supra,* 36 U.S.F. L.Rev. at pp. 1047-1049.) Thus, under these compacts, California has exchanged statewide exclusivity of class III gaming rights for the tribes' agreement to share revenues with the state to offset expenses related to tribal gaming and with other tribes that are not engaged in gaming. (Gov. Code, §§ 12012.75, 12012.85; see generally *Proposition 1A, supra,* 36 U.S.F. L.Rev. at p. 1051.)

 In opposing respondents' demurrer, appellants argued that the "IGRA does not attempt to grant a monopoly to Indian tribes on Class III

suits arising out of disputes in negotiations for new or amended tribal-state compacts. (*Hotel Employees, supra,* 21 Cal.4th at p. 615.) Government Code section 12012.5, subdivision (e) provides that the "Governor is authorized to waive the state's immunity to suit in federal court in connection with any compact negotiated with an Indian tribe or any action brought by an Indian tribe under the Indian Gaming Regulatory Act . . . ."

gaming, nor does it authorize states to establish a system which grants a monopoly to Indian tribes while prohibiting the conduct of Class III gaming by non Indians." Appellants' arguments revolve around the section 2710(d)(1)(B) provision of the IGRA, which states that class III gaming activities are only lawful on Indian lands if such activities are "located in a State that permits such gaming for any purpose by any person, organization, or entity." Thus, appellants contend that section 2710(d)(1)(B) precludes California from granting Indian tribes exclusive class III gaming rights because Congress intended that such gaming would only take place in states that permitted non-Indians to conduct similar gaming activities. If appellants' statutory interpretation is correct, the state must permit the tribes' non-Indian competitors to conduct similar types of gaming as a precondition for entering into a class III tribal gaming compact.

In rebuttal, respondents argue that the tribal-state class III gaming compacts, standing alone, are sufficient state authorization to satisfy the provision of the IGRA that the state "permits" class III gaming to "any person, organization or entity." Respondents contend that appellants, in essence, are rewriting the statute to read, "Class III gaming activities shall be lawful on Indian lands only if such activities are . . . located in a State that permits such gaming for any purpose 'by any person, organization or entity . . . *in addition to an Indian Tribe.*'" (Original italics.)

■ Statutory interpretation is a question of law, which we decide de novo. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; *Schwetz v. Minnerly* (1990) 220 Cal.App.3d 296, 302 [269 Cal.Rptr. 417].) ■ Our task is to "'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining that intent, we first examine the words of the . . . statute[]: 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]"' [Citation.] If, however, the terms of a statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] 'We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.'" (*People v. Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].)

■ We find the text of section 2710(d)(1)(B) ambiguous. (But see *Rumsey, supra,* 64 F.3d at p. 1257.) Without resort to legislative history,

context, or purpose, it is not possible to discern its textual meaning. In so doing, we conclude that there is nothing to indicate that the purpose of section 2710(d)(1)(B) was to achieve economic parity between tribes and commercial gaming establishments, thus leveling the playing field, so to speak, by granting tribes gaming rights only to the extent they are afforded to non-Indian gaming establishments.

Instead, the IGRA was crafted to accommodate disparate interests between tribes and state governments; that is, to reconcile the claims by tribes that their sovereignty prevented state control over the use of Indian lands, while preserving state autonomy to prohibit gambling within its borders. Thus, section 2710(d)(1)(B), as an initial step, required that states approve the form of proposed gaming before it would be allowed on Indian land under the IGRA. "The State must first legalize a game, *even if only for tribes,* before it can become a compact term." (*American Greyhound Racing Inc. v. Hull* (D.Ariz. 2001) 146 F.Supp.2d 1012, 1067, italics added, vacated on procedural grounds by *American Greyhound Racing, supra,* 305 F.3d 1015; *Artichoke Joe's, supra,* 216 F.Supp.2d at p. 1122.)

This is a vastly different interpretation than that urged by appellants. Quite simply, Congress exhibited no desire to command states[13] to enact gaming laws so that private non-Indian enterprises would enjoy the same rights as Indian tribes. The court in *Artichoke Joe's* comprehensively analyzed section 2710(d)(1)(B) and came to a similar conclusion. The court reasoned, "California's decision to 'permit' tribes to operate class III gaming facilities within the context of IGRA and the compacts, while denying those rights to other persons, organizations, and entities, is a policy judgment, which whether one agrees with it or not, does not conflict with IGRA's goal of maintaining state authority while protecting Indian gaming from discrimination. By contrast, to interpret IGRA to require the states to cho[o]se between no class III gaming anywhere and class III gaming everywhere would not further any of IGRA's goals and would limit the states' authority and flexibility without any resulting benefit to the tribes." (*Artichoke Joe's, supra,* 216 F.Supp.2d at p. 1126.)

We believe the *Artichoke Joe's* court has correctly perceived the practical public policy repercussions of this case and has adopted an interpretation of

---

[13]In view of the strong commitment to state sovereignty evidenced by the 10th Amendment to the United States Constitution, any such an interpretation would raise serious constitutional questions. (See, e.g., *New York v. United States* (1992) 505 U.S. 144, 179 [112 S.Ct. 2408, 2430, 120 L.Ed.2d 120] [Congress lacks the authority to "command state legislatures to legislate"]; *Printz v. United States* (1997) 521 U.S. 898, 935 [117 S.Ct. 2365, 2384, 138 L.Ed.2d 914] ["The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program"].)

section 2710(d)(1)(B) consistent with the statutory language that gives significance to the statutory framework as a whole. We concur in its reasoning.

## D.

■■■ Appellants alternatively contend the "enforcement of gambling laws which prohibit appellants from offering Class III games but allow tribal Indians to offer such games" violates both their state and federal constitutional guarantees of equal protection under the law. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.)[14]

Equal protection analysis requires a reconciliation of the constitutional promise that no person shall be denied the equal protection of the laws with the practical reality that most legislation classifies for one purpose or another, with resulting advantage or disadvantage to various groups or persons. (*Romer v. Evans* (1996) 517 U.S. 620, 631 [116 S.Ct. 1620, 1626-1627, 134 L.Ed.2d 855].) "Individuals receive, or correspondingly are denied, governmental benefits on the basis of income, disability, veteran status, age, occupation and countless other grounds." (*Coalition for Economic Equity v. Wilson* (9th Cir. 1997) 122 F.3d 692, 702.) As a general rule, such legislative classifications are presumptively valid. If the law neither burdens a fundamental right nor targets a suspect class, a court will uphold the classification as long as there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. (*Heller v. Doe* (1993) 509 U.S. 312, 319-320 [113 S.Ct. 2637, 2642-2643, 125 L.Ed.2d 257]; *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 913 [13 Cal.Rptr.2d 245, 838 P.2d 1198].)

However, when such a classification is based on a suspect class, such as race, the court must apply strict scrutiny and uphold the legislation only if it is a narrowly tailored measure that furthers compelling governmental interests. (See, e.g., *Adarand Constructors, Inc. v. Pena* (1995) 515 U.S. 200, 227 [115 S.Ct. 2097, 2112-2113, 132 L.Ed.2d 158] [remedial race-based preference is subject to strict scrutiny].)

■■ Appellants insist that the strict scrutiny test applies here. They argue: "The first amended complaint alleges facts which demonstrate that

[14]Our state constitutional guarantee of equal protection is substantially similar to that contained in the United States Constitution, and the analysis of equal protection claims is substantially the same. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 571-573 [117 Cal.Rptr.2d 168, 41 P.3d 3]; *Cohan v. Alvord* (1984) 162 Cal.App.3d 176, 181 [208 Cal.Rptr. 421].) Therefore, our references to "equal protection" or the "equal protection clause" encompass both.

appellants and tribal Indians are similarly situated in that both operate businesses which offer gambling to the general California public; that the classification established by California law which allows tribal Indians to offer Class III gaming is racial and thus subject to strict scrutiny review, and that it cannot be constitutionally justified based on that review."

We are satisfied that the rational relationship test applies to this case, rather than the more stringent strict scrutiny test. The United States Supreme Court has held that "[t]he decisions of this Court leave no doubt that federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications." (*United States v. Antelope* (1977) 430 U.S. 641, 645 [97 S.Ct. 1395, 1398, 51 L.Ed.2d 701].) Instead, tribal Indians belong to a political group that is specifically recognized by federal law as a sovereign nation.

These principles underlie the United States Supreme Court's unanimous decision in *Morton v. Mancari* (1974) 417 U.S. 535 [94 S.Ct. 2474, 41 L.Ed.2d 290] (*Mancari*). In *Mancari*, non-Indians challenged an employment preference for Indians of one-quarter blood or more used by the Bureau of Indian Affairs (BIA) on the ground that it discriminated on the basis of race. (*Id.* at p. 539 [94 S.Ct. at p. 2477].) The court disagreed, grounding its decision on "[t]he plenary power of Congress to deal with the special problems of Indians" and "the assumption of a 'guardian-ward' status." (*Id.* at pp. 551-552 [94 S.Ct. at p. 2483].) As the court noted, Congress has directed innumerable laws to Indians; and "[i]f these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized." (*Id.* at p. 552 [94 S.Ct. at pp. 2484-2485].) Applying this broad mandate, legislation preferring Indians is constitutional when applying the rational basis test "[as] long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." (*Id.* at p. 555 [94 S.Ct. at p. 2485].)

Justice Harry Blackmun, writing for the court, explained the court's view of the employment preference for Indians as a nonracial classification: "Contrary to the characterization made by appellees, this preference does not constitute 'racial discrimination.' Indeed, it is not even a 'racial' preference. Rather, it is an employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups." (*Mancari, supra,* 417 U.S. at pp. 553-554 [94 S.Ct. at p. 2483], fn. omitted.) The court's position was further explained in a related footnote: "The preference is not directed towards a 'racial' group

consisting of 'Indians'; instead, it applies only to members of 'federally recognized' tribes. This operates to exclude many individuals who are racially to be classified as 'Indians.' In this sense, the preference is political rather than racial in nature. . . ." (*Id.* at p. 553, fn. 24 [94 S.Ct. at p. 2484].)

Relying on the reasoning in *Mancari*, respondents argue that granting Indians exclusive gaming rights pursuant to the IGRA does not benefit a racial group (Indians), but rather benefits members of a political group (members of federally recognized tribes), essentially all of whom also happen to be members of that racial group. Respondents contend: "The voter-enacted initiative, Proposition 1A, authorized federally-recognized Indian *tribes*, not Indians individually or generally, to conduct specified class III gaming under limited and narrowly delineated circumstances."

Respondents' argument is materially advanced by the parallel analysis in *Artichoke Joe's*. "As *Mancari* illustrates, a tribal preference is not transformed from a political to a racial classification that requires strict scrutiny merely because the vehicle for the preference consists of individual members of tribes." (*Artichoke Joe's, supra*, 216 F.Supp.2d at p. 1132.) The *Artichoke Joe's* court concluded its analysis on this point in the following passage: "Individual members are benefited not because they are Indian per se but because they are members of tribes that have entered into compacts and distributed the resulting income to their members. A contrary holding would both distort *Mancari* and hamstring the political branches in the exercise of their trust obligation to the Indian tribes." (*Ibid.*, fn. omitted.)

Although legal commentators have criticized *Mancari*'s characterization of preferences based on tribal membership as being "political" rather than "racial,"[15] to date, *Mancari* has not been overruled. In fact, the United States Supreme Court has repeatedly embraced the *Mancari* rationale in numerous cases. (See, e.g., *Washington v. Fishing Vessel Assn.* (1979) 443 U.S. 658, 673, fn. 20 [99 S.Ct. 3055, 3068, 61 L.Ed.2d 823] [court "has repeatedly held that the peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf when rationally related to

---

[15]See Johnson and Crystal, *Indians and Equal Protection* (1979) 54 Wash. L.Rev. 587, 598, footnote 78 ("The Court's characterizing the classification as political, however, is not useful in determining what level of scrutiny to apply to federal Indian legislation in equal protection cases."); Williams, *The Borders of The Equal Protection Clause: Indians as Peoples* (1991) 38 UCLA L.Rev. 759, 790-791 ("[T]he citations to the [racial/political] distinction seem almost talismanic; a magical incantation, without accompanying analysis, to make the issue go away rather than to address it"); Farnsworth, *Bureau of Indian Affairs Hiring Preferences After Adarand Constructors, Inc. v. Pena* (1996) 1996 BYU L.Rev. 503, 509-510 ("To say, as the *Mancari* Court did, that the criteria was 'not even a "racial" preference' stretches the imagination, and is comparable to suggesting that discriminating on the basis of pregnancy is not the same as discrimination on the basis of gender").

the Government's 'unique obligation toward the Indians,' " quoting *Mancari, supra,* 417 U.S. at p. 555 [94 S.Ct. at p. 2485]]; *Washington v. Yakima Indian Nation* (1979) 439 U.S. 463, 500-501 [99 S.Ct. 740, 761, 58 L.Ed.2d 740] ["It is settled that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive," quoting *Mancari, supra,* 417 U.S. at pp. 551-552 [94 S.Ct. at p. 2483]]; *Delaware Tribal Business Comm. v. Weeks* (1977) 430 U.S. 73, 85 [97 S.Ct. 911, 919, 51 L.Ed.2d 173] ["the legislative judgment should not be disturbed '[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians,' " quoting *Mancari, supra,* 417 U.S. at p. 555 [94 S.Ct. at p. 2485].)

Indeed, when applying *Mancari,* the court "has never overturned a statute or treaty affecting Indians or natives." (*Williams v. Babbitt* (9th Cir. 1997) 115 F.3d 657, 663 (*Williams*).) At the same time, the court has repeatedly found "the argument that such classifications [based on tribal status and land tenure] are 'suspect' an untenable one." (*Washington v. Yakima Indian Nation, supra,* 439 U.S. at p. 501 [99 S.Ct. at p. 761].)[16]

Faced with the weight of this authority, appellants seek to limit the effect of the *Mancari* decision here by arguing its reach is limited to classifications "based on tribal status as a political entity which is limited to uniquely Indian matters such as self governance." Thus, appellants contend the rationale for the *Mancari* rule is absent if "Congress extend[s] that special treatment to matters beyond self governance and similarly uniquely Indian issues." At that point, "the classification becomes racial and fails strict scrutiny review."

In support of this argument, appellants direct our attention to *Williams, supra,* 115 F.3d 657. In an opinion written by Judge Alex Kozinski, the Ninth Circuit held unconstitutional on equal protection grounds an administrative interpretation of the federal Reindeer Industry Act of 1937, which prohibited non-Indians from herding reindeer in Alaska. The court applied a

---

[16]Appellants claim that *Mancari* has been limited by the United States Supreme Court's recent decision in *Rice v. Cayetano* (2000) 528 U.S. 495 [120 S.Ct. 1044, 145 L.Ed.2d 1007] (declaring a Hawaiian statute unconstitutional that allowed only descendents of indigenous Hawaiians to vote for certain public officials, to the exclusion of all nonnative Hawaiian citizens). However, appellants' attempt to limit *Mancari* is unconvincing. *Rice* involved native Hawaiians, who do not possess a tribal form of organization and have no formally recognized sovereign-to-sovereign relationship with the United States. Furthermore, *Rice* did not involve a 14th Amendment equal protection claim, but only dealt with the right to vote guaranteed by the 15th Amendment, which is a fundamental right evoking strict scrutiny review. (See *Rice,* at pp. 498-499 [120 S.Ct. at pp. 1047-1048].)

strict scrutiny analysis and rejected arguments that *Mancari* authorized blanket preferences for Indians. The court stated: "While *Mancari* did not have to confront the question of a naked preference for Indians unrelated to unique Indian concerns, [the administrative] interpretation of the Reindeer Act would force us to confront that very issue. According to [the administrative agency], the Reindeer Act provides a preference in an industry that is not uniquely native, whether the beneficiaries live in a remote native village on the Seward Peninsula or in downtown Anchorage. The Act in no way relates to native land, tribal or communal status, or culture." (*Id.* at p. 664.)

The court observed that no law giving "natives so broad a preference" in any particular industry was known to exist. (*Williams, supra,* 115 F.3d at pp. 664.) The court explained that *Mancari*'s rationale embraced legislation that affected "Indian land, tribal status, self-government or cultur[al]" issues. (*Ibid.*) The court clarified that "[w]hile *Mancari* is not necessarily limited to statutes that give special treatment to Indians on Indian land, we do read it as shielding only those statutes that affect uniquely Indian interests. [Citation.]" (*Id.* at p. 665.) Consequently, the court indicated it was "seriously doubt-[ful]" whether Congress could grant Indians "*a complete monopoly on the casino industry* or on Space Shuttle contracts." (*Ibid.,* italics added.) Applying a strict scrutiny standard, the court held the Department's interpretation of federal law could not withstand analysis.[17] (*Williams,* at pp. 665-666.)

Appellants believe *Williams* lends substantial support to their argument "that this situation involves a racial classification and violates appellants['] right to equal protection under the law." However, we note that the monopoly over the casino industry hypothesized in *Williams* makes no mention of the IGRA or the federal policies it seeks to implement. We believe that Judge Kozinski's provocative dicta, when considered in context, can best be understood as casting constitutional doubt on Indian-run gaming monopolies

---

[17]The decision and analysis in *Williams* has not escaped criticism. "Out of antipathy to *Mancari*'s lax standard, Judge Kozinski may be attempting to introduce more bite into it than the Supreme Court ever intended." (Goldberg, *American Indians and "Preferential" Treatment* (2002) 49 UCLA L.Rev. 943, 960.)

We note that *Williams*'s suggestion that *Mancari* is limited to classifications "that affect uniquely Indian interests" has not been found to be persuasive even by the Ninth Circuit. (*Williams, supra,* 115 F.3d at p. 665.) For example, in *Alaska Chapter Associated Gen. Contr. v. Pierce* (9th Cir. 1982) 694 F.2d 1162, another panel of that court cited cases where the United States Supreme Court relied upon *Mancari* and applied the rational basis test to interests "which are much broader than tribal self-government." (*Ibid.*) These cases include *Moe v. Salish & Kootenai Tribes* (1976) 425 U.S. 463, 479-480 [96 S.Ct. 1634, 1644-1645, 48 L.Ed.2d 96] (right of individual Indian profit-making businesses to be free from state taxation); *Washington v. Fishing Vessel Assn., supra,* 443 U.S. at page 673, footnote 20 [99 S.Ct. at page 3068] (right to fish); and *United States v. Antelope* (1977) 430 U.S. 641, 646-647 and footnote 7 [97 S.Ct. 1395, 1399, 51 L.Ed.2d 701] (imposition of federal rather than state law on Indians committing crimes on reservations).

formed solely for business purposes untethered to any declared federal objective of strengthening tribal self government or promoting the tribe's economic development. That is not the situation here.

We conclude that the challenged tribal-state compacts, granting Indians the exclusive right to conduct class III gaming in California pursuant to the IGRA, are rationally related "to the fulfillment of Congress' unique obligation towards Indians" and therefore passes constitutional examination under the rational basis test. (*Mancari, supra,* 417 U.S. at p. 555 [94 S.Ct. at p. 2485].) As already noted, the predominant purpose of the IGRA is: "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." (§ 2702(1).) Additionally, the IGRA requires that all gaming proceeds, with very limited exceptions, be allocated for tribal government purposes only (see § 2710(b)(1)(B)), such as "(i) to fund tribal government operations or programs; [¶] (ii) to provide for the general welfare of the Indian tribe and its members; [¶] (iii) to promote tribal economic development; [¶] (iv) to donate to charitable organizations; or [¶] (v) to help fund operations of local government agencies." (§ 2710(b)(2)(B).)

The model tribal-state compact, which is part of our record on appeal, similarly indicates that its purpose is to "[d]evelop and implement a means of regulating Class III gaming, and only Class III gaming, on the Tribe's Indian lands to ensure its fair and honest operation in accordance with IGRA, and through that regulated Class III gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs." Consistent with this goal, a portion of the money generated by gaming tribes is to be paid into the Indian Gaming Revenue Sharing Trust Fund pursuant to the terms of tribal-state gaming compacts for the purpose of making distributions to non-compact tribes. Our record discloses that the first $25 million paid into the Indian Gaming Revenue Sharing Trust Fund has recently been distributed to non-gaming tribes. (*Proposition 1A, supra,* 36 U.S.F. L.Rev. at p. 1044.) This mechanism is intended to ensure that the wealth generated by gambling is not just limited to tribes who have entered into compacts, but will be redistributed for the benefit of all tribes in California.[18]

In light of all of the foregoing, we conclude, as the *Artichoke Joe's* court did, that granting certain federally recognized tribes exclusive class III

---

[18]We recognize this assertion, too, is the subject of continuing public and media debate. (See fn. 7, *ante.*) However, the record on appeal includes no suggestion that the Indian Gaming Revenue Sharing Trust Fund is not actually operating as designed, or that a significant number of federally recognized Indian tribes in California are not reaping the economic benefits intended by the IGRA.

gaming rights through the tribal-state compacts challenged herein passes constitutional muster under the rational basis test and does not constitute a denial of equal protection.

## IV.

The judgment is affirmed.

Kline, P. J., and Haerle, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 9, 2003.