McCRACKEN AND AMICK, INCORPORATED D/B/A THE NEW VEMCO MUSIC CO. AND RALPH AMICK, PLAINTIFFS V. BEVERLY EAVES PERDUE, IN HER OFFICIAL CAPACITY AS GOVERNOR OF NORTH CAROLINA, DEFENDANT

No. COA09-431

(Filed 22 December 2009)

**Indians— federal Indian gaming law—preferential gaming rights**

The trial court erred in a declaratory judgment action by granting judgment in favor of plaintiffs on their claim that the State is not permitted under federal Indian gaming law to grant the Eastern Band of Cherokee Indians of North Carolina exclusive rights to conduct certain gaming on tribal land while prohibiting it throughout the rest of the State. N.C.G.S. § 71A-8 reflects a policy decision by the General Assembly to extend preferential gaming rights in deference to a separate sovereign entity residing within its borders.

Appeal by defendant from order entered 19 February 2009 by Judge Howard E. Manning, Jr. in Wake County Superior Court. Heard in the Court of Appeals 14 October 2009.

## McCRACKEN & AMICK, INC. v. PERDUE

[201 N.C. App. 480 (2009)]

*Everett Gaskins Hancock & Stevens, LLP, by Hugh Stevens, Michael J. Tadych, and James M. Hash, for plaintiffs-appellees.*

*Attorney General Roy Cooper, by Special Deputy Attorney General Mark A. Davis, for defendant-appellant.*

*Eastern Band of Cherokee Indians, by Attorney General Annette Tarnawsky; Ben Oshel Bridgers, PLLC, by Ben Oshel Bridgers; and Holland & Knight LLP, by Frank Lawrence, Los Angeles, California, pro hac vice, for amici curiae Eastern Band of Cherokee Indians, National Congress of American Indians, National Indian Gaming Association, United South and Eastern Tribes, Arizona Indian Gaming Association, and Poarch Band of Creek Indians of Alabama.*

HUNTER, Robert C., Judge.

The State appeals from the trial court's order entering judgment in favor of plaintiffs McCracken and Amick, Incorporated, doing business as The New Vemco Music Co., and its principal owner, Ralph Amick, on their claim that the State is not permitted under federal Indian gaming law to grant the Eastern Band of Cherokee Indians of North Carolina ("the Tribe") exclusive rights to conduct certain gaming on tribal land while prohibiting it throughout the rest of the State. We conclude, however, that state law providing the Tribe with exclusive gaming rights does not violate federal Indian gaming law. Consequently, we reverse the trial court's order.

### Facts and Procedural History

In 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 through 2721 ("IGRA"), in order "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[.]"[1] 25 U.S.C. § 2702(1). IGRA creates three classes of gaming: Class I gaming is defined as "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). Class II gaming includes bingo and card games (other than banking card games) operated in accordance with state law regarding the amount of wagers

---

1. IGRA was enacted in response to *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 94 L. Ed. 2d 244 (1987), where the United States Supreme Court held that states could not enforce state laws *regulating* gaming against Indian tribes—only criminal statutes *prohibiting* gaming could be enforced under federal law.

and hours of operation. 25 U.S.C. § 2703(7). Class III gaming encompasses "all forms of gaming that are not class I gaming or class II gaming," including slot machines, casino-style games, banking card games, video games, and lotteries. 25 U.S.C. § 2703(8). With respect to Class III gaming, IGRA requires a compact between the federally recognized Indian tribe and the State prior to the tribe being permitted to conduct Class III gaming on its land.

In August 1994, the Tribe entered into a compact with the State of North Carolina that permits the Tribe to conduct "raffles," "video games," and "other Class III gaming which may be authorized" in writing by the Governor. Under the compact, the Tribe operates Harrah's Cherokee Casino in Cherokee, North Carolina, which attracts more than 3.5 million visitors a year and generates annual revenues over $250,000,000. In 2000, the terms of the compact were extended until 2030.

Prior to 1 July 2007, video poker was legal in North Carolina but heavily regulated. In 2006, the General Assembly enacted Senate Bill 912, which became Chapter 6 of the 2006 Session Laws ("S.L. 2006-6").[2] S.L. 2006-6 phased out the number of video poker machines permitted in the State and banned them completely as of 1 July 2007. S.L. 2006-6 repealed N.C. Gen. Stat. § 14-306.1 (2005), which legalized and regulated video poker, and enacted N.C. Gen. Stat. § 14-306.1A (2007), which, effective 1 July 2007, made it "unlawful for any person to operate, allow to be operated, place into operation, or keep in that person's possession for the purpose of operation any video gaming machine," including video poker machines. N.C. Gen. Stat. § 14-306.1A(a). Although N.C. Gen. Stat. § 14-306.1A criminalizes video poker in general in North Carolina, the legislature carved out an exception from the ban for "a federally recognized Indian tribe," making it lawful for a tribe to possess and operate video poker machines on tribal land "if conducted in accordance with an approved Class III Tribal-State Compact applicable to that tribe . . . ." N.C. Gen. Stat. § 14-306.1A(a). S.L. 2006-6 also contains a voiding clause, providing that "[i]f a final Order by a court of competent jurisdiction prohibits possession or operation of video gaming machines by a federally recognized Indian tribe because that activity is not allowed elsewhere in this State, this act is void."

Plaintiffs own and operate video games, vending machines, and amusement devices, such as juke boxes, pinball machines, and pool

2. Act of June 6, 2006, ch. 6, sec. 4, 2006 N.C. Sess. Laws 6-6.

tables. Prior to 1 July 2007, plaintiffs' business also included selling, leasing, distributing, operating, and maintaining video poker machines. On 10 November 2008, plaintiffs filed a declaratory judgment action against the State, alleging that the State is not permitted under IGRA to grant the Tribe a gaming "monopoly" withing the State. Plaintiffs also asserted a "separation of powers" violation in that "the authority to negotiate, approve and execute tribal-state compacts or amendments to the existing Compact is reserved to the General Assembly"—not the Governor.

On 21 November 2008, the State moved to dismiss plaintiffs' complaint on multiple grounds, including: (1) lack of standing; (2) failure to state a claim for relief; and (3) failure to join a necessary party—the Tribe—to the action. On 18 February 2009, plaintiffs took a voluntary dismissal of their separation of powers claim. With the consent of the parties, the trial court converted the State's motion to dismiss into a motion for judgment on the pleadings with respect to plaintiff's IGRA claim.

The trial court entered an order on 19 February 2009, concluding that "IGRA does not permit a state to ban the possession and operation of video gaming machines elsewhere in the state while allowing their possession and operation on tribal lands." Thus, the trial court "declare[d] that the State acted unlawfully in authorizing the Eastern Band of the Cherokee Indians to possess and operate video gaming machines on tribal lands within North Carolina because that activity is not allowed elsewhere in this State; pursuant to Section 12 of SL 2006-6, this declaration renders G.S. § 14-306.1A null, void and of no effect." Consequently, the trial court entered judgment on the pleadings in favor of plaintiffs. The State noticed appeal from the trial court's order and the trial court stayed "the operation and effect of [its] rulings . . . pending the resolution of the State's appeal."

## Standard of Review

The State contends that the trial court erred in entering judgment on the pleadings in favor of plaintiffs.[3] On appeal, the trial court's

---

3. *Amici curiae* argue that the Tribe is a necessary party to this action and thus the trial court erred in not joining the Tribe prior to entering judgment. Although the State moved to dismiss on this basis, the trial court did not rule on this issue, the State did not assign error to the court's failure to address the issue, and the State presents no argument on appeal that the Tribe is an unjoined necessary party. As the issue is raised only in the *amici curiae's* brief, we decline to address the issue in the absence of exceptional circumstances. *See Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003) [hereinafter *Artichoke Joe's II*] (declining to

grant of a motion for judgment on the pleadings pursuant to N.C.R. Civ. P. 12(c) is reviewed de novo. *Toomer v. Branch Banking & Tr. Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335, *disc. review denied*, 360 N.C. 78, 623 S.E.2d 263 (2005). Judgment on the pleadings is proper "when all the material allegations of fact are admitted in the pleadings and only questions of law remain." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974).

## Validity of S.L. 2006-6

As the trial court correctly points out, this case "arises out of the interplay" between IGRA, the tribal-state compact between the Tribe and the State of North Carolina, and the State's criminalization of video gaming machines pursuant to S.L. 2006-6. IGRA "divides gaming on Indian lands into three classes—I, II, and III—and provides a different regulatory scheme for each class." *Seminole Tribe v. Florida*, 517 U.S. 44, 48, 134 L. Ed. 2d 252, 262 (1996). IGRA dictates that Class III gaming, the category at issue here, is "lawful on Indian lands only if such activities are": (1) authorized by an approved tribal ordinance or resolution; (2) "located in a State that permits such gaming for any purpose by any person, organization, or entity"; and (3) conducted in conformance with a tribal-state compact in effect. 25 U.S.C. § 2710(d)(1)(A)-(C); *Seminole Tribe*, 517 U.S. at 48-49, 134 L. Ed. 2d at 261-62.

Through Chapter 71A of the General Statutes, the chapter dealing with "Indians," the General Assembly permits gaming by federally recognized tribes on tribal lands provided that the gaming is authorized by a tribal-state compact:

In recognition of the governmental relationship between the State, federally recognized Indian tribes and the United States, a federally recognized Indian tribe may conduct games consistent with the Indian Gaming Regulatory Act, Public Law 100-497, that are in accordance with a valid Tribal-State compact executed by the Governor pursuant to G.S. 147-12(14) and approved by the U.S. Department of Interior under the Indian Gaming Regulatory Act, and such games shall not be unlawful or against the public policy of the State if the State permits such gaming for any purpose by any person, organization, or entity.

address whether tribe was necessary party to challenge to the validity of tribal-state gaming compacts because the issue was "raised only in an amicus brief"), *cert. denied*, 543 U.S. 815, 51, 160 L. Ed. 2d 20 (2004).

N.C. Gen. Stat. § 71A-8 (2007). The Fourth Circuit has recognized that "North Carolina, citing the IGRA and acknowledging that the Eastern Band of Cherokee Indians is a federally recognized Indian tribe, . . . authorized, subject to various regulations, Class III gaming, the operation of video gaming devices, and the administering of raffles." *United States v. Garrett*, 122 Fed. Appx. 628, 630 (4th Cir. 2005).

In 2006, the General Assembly enacted S.L. 2006-6, codified as N.C. Gen. Stat. § 14-306.1A, which provides in pertinent part:

> (a) Ban on Machines.—It shall be unlawful for any person to operate, allow to be operated, place into operation, or keep in that person's possession for the purpose of operation any video gaming machine as defined in subsection (b) of this section, except for the exemption for a federally recognized Indian tribe under subsection (e) of this section for whom it shall be lawful to operate and possess machines as listed in subsection (b) of this section if conducted in accordance with an approved Class III Tribal-State Compact applicable to that tribe, as provided in G.S. 147-12(14) and G.S. 71A-8.

> . . . .

> (e) Exemption for Activities Under IGRA.—Notwithstanding any other prohibitions in State law, the form of Class III gaming otherwise prohibited by subsections (a) through (d) of this section may be legally conducted on Indian lands which are held in trust by the United States government for and on behalf of federally recognized Indian tribes if conducted in accordance with an approved Class III Tribal-State Gaming Compact applicable to that tribe as provided in G.S. 147-12(14) and G.S. 71A-8.

N.C. Gen. Stat. § 14-306.1A(a), (e).

Determining whether S.L. 2006-6 and the Tribal-State compact violate IGRA requires interpretation of 25 U.S.C. § 2710(d)(1)(B), the provision regulating Class III gaming on Indian lands. Questions of statutory interpretation are questions of law, reviewed de novo on appeal. *Hudson v. Hudson*, 299 N.C. 465, 472, 263 S.E.2d 719, 724 (1980). The primary objective of statutory interpretation is to ascertain and effectuate the intent of the legislature. *Burgess v. Your House of Raleigh*, 326 N.C. 205, 209, 388 S.E.2d 134, 137 (1990). To this end, the court must first determine whether the statutory language is clear and unambiguous, and if so, it "will apply the plain meaning of the words, with no need to resort to judicial construc-

tion." *Wiggs v. Edgecombe Cty.*, 361 N.C. 318, 322, 643 S.E.2d 904, 907 (2007). Judicial construction is necessary to ascertain legislative intent only where the statutory language is ambiguous. *Burgess*, 326 N.C. at 209, 388 S.E.2d at 137.

The parties' disagreement focuses on the proper meaning of 25 U.S.C. § 2710(d)(1)(B), which provides that "Class III gaming activities shall be lawful on Indian lands only if such activities are . . . (B) located in a State that permits such gaming for any purpose by any person, organization, or entity[.]" This provision raises two separate but related issues of interpretation: (1) whether S.L. 2006-6, which authorizes Class III gaming only by tribes and only on tribal land, satisfies § 2710(d)(1)(B)'s prerequisite that North Carolina be a state that "permits such gaming"; and (2) whether the scope of the language "any person, organization, or entity" includes Indian tribes.

### "Permits Such Gaming"

With respect to IGRA's "permits such gaming" provision, plaintiffs maintain that a state that, with the exception of tribal gaming, prohibits Class III gaming statewide does not, as a matter of public policy, "permit such gaming." Plaintiffs contend that S.L. 2006-6 cannot be reconciled with 25 U.S.C. 2701(5), which provides that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is *conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.*" (Emphasis added.) Plaintiffs maintain that the public policy of the State, as expressed by the General Assembly in S.L. 2006-6, is generally to prohibit Class III gaming notwithstanding the exception provided for federally recognized tribes. Thus, plaintiffs argue, because the overarching public policy of the State is to prohibit Class III gaming, the State does not "permit such gaming" under § 2710(d)(1)(B).

The State counters that the "plain language" of the statute "allows a State to ban video gaming statewide but to carve out an exception for gaming occurring on tribal land pursuant to a Tribal/State compact." The State argues that N.C. Gen. Stat. § 71A-8 and N.C. Gen. Stat. § 14-306.1A(e) clearly "articulat[e]" the public policy of North Carolina: "These laws reflect a policy decision by the General Assembly to extend preferential gaming rights in deference to a separate sovereign entity residing within its borders." Thus, the State claims, North Carolina "permits" Class III gaming as required by IGRA.

"The legislative branch of government is without question 'the policy-making agency of our government . . . .' " *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004) (quoting *McMichael v. Proctor*, 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956)). "[W]here the law-making power speaks on a particular subject over which it has power to legislate, public policy in such cases is what the law enacts." *Cauble v. Trexler*, 227 N.C. 307, 311, 42 S.E.2d 77, 80 (1947). Here, the General Assembly has expressed the public policy of the State through N.C. Gen. Stat. § 71A-8, which explicitly authorizes Indian gaming in accordance with IGRA, and N.C. Gen. Stat. § 14-306.1A, which criminalizes Class III gaming in North Carolina except for the Tribe's enterprises. *See Hatcher v. Harrah's N.C. Casino Co., LLC*, 169 N.C. App. 151, 156, 610 S.E.2d 210, 213 (2005) (holding that "trial court erred by concluding that North Carolina public policy is violated by the video poker machine operated by the Eastern Band of Cherokee Indians"). S.L. 2006-6's voiding clause, moreover, manifests the Legislature's intent that the Tribe should retain its Class III gaming rights under the tribal-state compact no matter what the outcome is of a challenge to S.L. 2006-6's legality—if upheld, the Tribe's Class III gaming is exempted from the statewide prohibition; if struck down, the statewide ban is invalidated.

This conclusion is bolstered by the reasoning of the district court in *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084 (E.D. Cal. 2002) [hereinafter *Artichoke Joe's I*], *aff'd*, 353 F.3d 712 (2003), *cert. denied*, 543 U.S. 815, 160 L. Ed. 2d 20 (2004). In interpreting IGRA's "permits such gaming" requirement, the district court observed that Congress had "employed capacious language to clarify the situations in which it would be lawful for Indian tribes to offer class III gaming":

> The Act does not define "permits"; neither placing restrictions on the word nor otherwise limiting its meaning. Section 2710(d)(1)(B) does not say "permits such gaming independently of IGRA for any purpose by any person, organization, or entity." It does not say "permits such gaming for any purpose by any person, organization, or entity other than Indian tribes." And it is precisely because Congress did not write the Act in either of these ways that [a state], subject to the Secretary[ of the Interior]'s approval, may "permit" class III gaming within the structure of IGRA, even though the permission is not entirely independent of IGRA, and even though IGRA prevents states from unilaterally legalizing tribal gaming. In short, the statute is written broadly, and it is consistent with the co-operative

federalism at the heart of IGRA to allow the state to "permit" tribal gaming under the Act by exempting the tribes from state prohibitions on [Class III gaming].

*Id.* at 1121.[4]

IGRA's legislative history also supports the State's position that IGRA permits states to grant tribes preferential gaming rights. *See Lilly v. N.C. Dept. of Human Resources*, 105 N.C. App. 408, 411-12, 413 S.E.2d 316, 318 (1992) (holding that legislative history of federal statute supported plain meaning of statutory language). When Congress was considering the Supreme Court's decision in *Cabazon*, two different bills were introduced: Senate Bill 555 and Senate Bill 1303. The majority of Senate Bill 555 was adopted and ultimately enacted by Congress as IGRA. The initial draft of Senate Bill 555, however, included § 11(d)(1) and (2), which provided in pertinent part:

(1) Except as provided in paragraph (2) of this subsection, class III gaming shall be unlawful on any Indian lands under section 1166 of title 18, United States Code.

(2)(A) *A gaming activity on Indian lands that is otherwise legal within the State where such lands are located* may be exempt from the operation of paragraph (1) of this subsection where the Indian tribe requests the Secretary to consent to the transfer of all civil and criminal jurisdiction, except for taxing authority, pertaining to the licensing and regulation of gaming over the proposed gaming enterprise to the State within which such gaming enterprise is to be located and the Secretary so consents.

133 Cong. Rec. 3740 (1987) (emphasis added). This language was taken out of the bill and the current, broader language was substituted from Senate Bill 1303. 133 Cong. Rec. 14332, § 10(b). Senate Bill 555's original language—"otherwise legal within the State"—supports plaintiffs' contention that persons, organizations, or entities other than the Tribe must be allowed to engage in Class III gaming activities in order for the State to permit the Tribe to conduct such gaming activities. As one federal appellate court observed, however: "The fact that the 'permits such gaming' text was taken from another bill

---

4. Although not binding on North Carolina's courts, the holdings and underlying rationale of lower federal courts may be considered persuasive authority in interpreting a federal statute. *Security Mills v. Trust Co.*, 281 N.C. 525, 529, 189 S.E.2d 266, 269 (1972).

suggests that the substitution was deliberate, and the particular substitution that the drafters chose implies that Congress intended a broader meaning than the one proposed by Plaintiffs." *Artichoke Joe's II*, 353 F.3d at 727. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43, 94 L. Ed. 2d 434, 455 (1987) (citation and internal quotation marks omitted). Based on the plain language of the statute, supported by its legislative history, we conclude that North Carolina satisfies § 2710(d)(1)(B)'s "permits such gaming" requirement.

### "Any Person, Organization, or Entity"

The parties similarly disagree about the meaning of IGRA's phrase "any person, organization, or entity." The State argues that because tribal gaming enterprises are not explicitly excluded from the phrase "any person, organization, or entity," IGRA enables the State to grant the Tribe exclusive Class III gaming rights. Plaintiffs, on the other hand, contend that it stands § 2710(d)(1)(B) "on its head" to read the phrase "any person, organization, or entity" as "includ[ing] the very tribe whose authority is at issue." Thus, plaintiffs argue, § 2710(d)(1)(B) must be read as requiring states to permit Class III gaming for any purpose by any *non-Indian* person, organization, or entity, if it permits it for the Tribe.

The focal point of the parties' arguments is the word "any." Under the State's reading of § 2710(d)(1)(B), "any" means "one"—the State may grant the Tribe exclusive Class III gaming rights under IGRA if state law permits Class III gaming for at least *one* purpose for at least *one* person, organization, or entity, including the Tribe itself. The State's interpretation of § 2710(d)(1)(B) is both reasonable and supported by the decisions of other courts of other jurisdictions that have addressed this issue. *See Artichoke Joe's I*, 216 F. Supp. 2d at 1122 ("The word 'any' can mean 'every' or 'one.' However, interpreting 'any' in § 2710(d)(1)(B) to mean 'every' must be rejected. . . . [Section] 2710(d)(1)(B) is best understood as allowing class III gaming compacts in states that permit that kind of gaming for at least one purpose, by at least one person, organization, or entity."); *American Greyhound Racing, Inc. v. Hull*, 146 F. Supp. 2d 1012, 1067 (D. Ariz. 2001) ("The State must first legalize a game, even if only for tribes, before it can become a compact term."), *vacated on procedural grounds*, 305 F.3d 1015 (9th Cir. 2002); *Dalton v. Pataki*, 5 N.Y.3d 243, 261, 835 N.E.2d 1180, 1190, 802 N.Y.S.2d 72, 82 (N.Y.) (con-

cluding that "if class III gaming is permitted in the state for any purpose, . . . it will be permitted on Indian land"), *cert. denied*, 546 U.S. 1032, 163 L. Ed. 2d 571 (2005).

According to plaintiffs' interpretation, however, "any" means "every"—in order for the State to grant the Tribe Class III gaming rights, state law must also allow every other person, organization, or entity within the State to conduct Class III gaming, albeit subject to regulation. This interpretation is likewise not unreasonable. *See Artichoke Joe's II*, 353 F.3d at 724 (holding that "[a]lthough the trend of judicial construction of § 2710(d)(1)(B) slightly favors" reading "any" as "one," interpreting "any" as "every" not unreasonable). We, therefore, conclude—as have all other appellate decisions we have found addressing this issue—that the phrase "any person, organization or entity" is ambiguous. *See id.* at 723 ("There is nothing in the text itself that definitively resolves whether Congress intended Indian tribes to fall within the scope of 'any person, organization, or entity' under this provision."); *Artichoke Joe's I*, 216 F. Supp. 2d at 1123 (considering legislative history of IGRA "to the extent that the language of § 2710(d)(1)(B) might be ambiguous"); *Flynt v. California Gambling Control Com.*, 104 Cal. App. 4th 1125, 1138, 129 Cal. Rptr. 2d 167, 178 (Cal. Ct. App. 2002) ("We find the text of section 2710(d)(1)(B) ambiguous."), *cert. denied*, 540 U.S. 948, 157 L. Ed. 2d 278 (2003).

When a statute is ambiguous, principles of statutory construction are necessary to discern legislative intent. *Young v. Whitehall Co.*, 229 N.C. 360, 367, 49 S.E.2d 797, 801 (1948). The best indicia of legislative intent are the purpose and spirit of the statute, the goal it sought to accomplish, its legislative history, and the circumstances surrounding its enactment. *Black v. Littlejohn*, 312 N.C. 626, 630, 325 S.E.2d 469, 473 (1985).

Congress provides that two of the primary purposes of IGRA are

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments; [and]

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players[.]

25 U.S.C. § 2702(1)-(2). The stated purposes of IGRA "strongly suggest[] that the thrust of the [statute] is to promote Indian gaming, not to limit it." *Grand Traverse Band v. Office of U.S. Atty.*, 369 F.3d 960, 971 (6th Cir. 2004). As recognized by other appellate courts, nowhere in Congress' "[d]eclaration of policy" is there any indication that IGRA was intended to establish parity between Indian and non-Indian gaming enterprises. *See, e.g.*, *Artichoke Joe's II*, 353 F.3d at, 728 ("Nowhere is there any reference to the idea that IGRA serves as a means of policing equality between Indian and non-Indian gaming operations in the context of class III gaming."); *Flynt*, 104 Cal. App. 4th at 1139, 129 Cal. Rptr. 2d at 178 ("Quite simply, Congress exhibited no desire to command states to enact gaming laws so that private non-Indian enterprises would enjoy the same rights as Indian tribes.").

More pertinent to this case, in *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766, 85 L. Ed. 2d 753, 759 (1985), the United States Supreme Court held that "the standard principles of statutory construction do not have their usual force in cases involving Indian law." One of the canons of construction that apply specially to Indian law, known as the *Blackfeet* presumption or trust doctrine, provides that federal statutes passed for the benefit of Indian tribes are to be liberally construed, with ambiguities being resolved in favor of the tribes. *Id.* at 767, 85 L. Ed. 2d at 760; *Three Affiliated Tribes v. Wold Engineering*, 467 U.S. 138, 150, 81 L. Ed. 2d 113, 123 (1984). In applying the *Blackfeet* presumption, any doubt as to the proper interpretation of a federal statute enacted for the benefit of an Indian tribe will be resolved in favor of the tribe as "[a]mbiguities in federal law have been construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-44, 65 L. Ed. 2d 665, 673 (1980).

Plaintiffs assert that the *Blackfeet* presumption "simply has no application here, because the legislative enactment at issue—Chapter 6 of the 2006 Session Laws—cannot be interpreted in any manner that is 'unfavorable' to the Tribe." Plaintiffs misunderstand the subject of the presumption; it applies to federal Indian law, not state law. *See Arizona Public Service Co. v. E.P.A.*, 211 F.3d 1280, 1293 (D.C. Cir. 2000) ("[C]ourts construe *federal* statutes liberally to benefit Native American nations." (Emphasis added.)).

It cannot be seriously disputed that IGRA—titled the *Indian Gaming Regulatory Act*—is a federal statute designed to benefit

Indian tribes. In its declaration of policy, Congress provides that one of the purposes of the gaming regulations in IGRA is to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1); *accord Artichoke Joe's II*, 353 F.3d at 730 ("IGRA is undoubtedly a statute passed for the benefit of Indian tribes."); *see also* Matthew L. M. Fletcher, *Bringing Balance to Indian Gaming*, 44 Harv. J. on Legis. 39, 51 (2007) ("Overall . . . Congress made clear that the purpose of [IGRA] was to benefit Indian tribes, not states, and to expand tribal opportunities for self-determination, self-government, economic development, and political stability."). Thus, because § 2710(d)(1)(B)'s phrase "any person, organization or entity" is ambiguous as to whether the Tribe is included within its scope, the *Blackfeet* presumption applies.

Plaintiffs argue that there is no way to apply the *Blackfeet* presumption in this case because neither their interpretation of § 2710(d)(1)(B) nor the State's is "more favorable to the Tribe than the other." According to plaintiffs, if, as the trial court held, S.L. 2006-6 violates IGRA, then its voiding clause is triggered and the Tribe may continue to conduct its Class III gaming activities on tribal land. If, on the other hand, S.L. 2006-6 complies with IGRA's requirements, then the Tribe retains its gaming rights under the tribal-state compact. Thus, according to plaintiffs, "the General Assembly has placed the Tribe in a 'win-win' position with respect to the outcome of this case."

Plaintiffs' characterization ignores the economic impact of invalidating S.L. 2006-6. The tribal-state compact between the Tribe and the State of North Carolina entitles the Tribe to conduct those Class III gaming activities specified in the compact. By prohibiting Class III gaming throughout the rest of the State, S.L. 2006-6 makes the Tribe's gaming rights exclusive. If S.L. 2006-6 were invalidated, the Tribe would no longer have preferential gaming rights, but instead would be in competition with other gaming enterprises, such as plaintiffs'. As their complaint states, the motivation behind this lawsuit is to "restore the plaintiffs' authority to engage in the video poker business." Plaintiffs' interpretation of § 2710(d)(1)(B) is inconsistent with IGRA's stated purposes of promoting tribal economic development, self-sufficiency, and strong tribal governments. *See Artichoke Joe's II*, 353 F.3d at 731 ("[T]he award of exclusive class III gaming franchises simply furthers the federal government's long-standing trust obligations to Indian tribes and helps promote their economic self-development.").

**PHOENIX LTD. P'SHIP OF RALEIGH v. SIMPSON**

[201 N.C. App. 493 (2009)]

In applying the presumption, we adopt the State's interpretation of the ambiguous phrase "any person, organization or entity," concluding that S.L. 2006-6, which legalizes the Tribe's Class III gaming rights, satisfies § 2710(d)(1)(B)'s requirement that North Carolina be a state "that permits such gaming for any purpose by any person, organization, or entity[.]" The trial court, therefore, erred in concluding that IGRA precluded North Carolina from granting the Tribe exclusive Class III gaming rights and entering judgment on this basis. We note, in conclusion that North Carolina's

> decision to "permit" tribes to operate class III gaming facilities within the context of IGRA and the compacts, while denying those rights to other persons, organizations, and entities, is a policy judgment, which whether one agrees with it or not, does not conflict with IGRA's goal of maintaining state authority while protecting Indian gaming from discrimination. By contrast, to interpret IGRA to require the states to cho[o]se between no class III gaming anywhere and class III gaming everywhere would not further any of IGRA's goals and would limit the states' authority and flexibility without any resulting benefit to the tribes.

*Artichoke Joe's I*, 216 F. Supp. 2d at 1126. The trial court's order is reversed.

Reversed.

Judges GEER and STEPHENS concur.